UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CLINT CHAMBERS,

       Plaintiff,

-vs-                              Case No.    5:11-cv-420-Oc-10TBS

UNITED STATES OF AMERICA and
CHRISTOPHER CRAIN,

       Defendants.

_____/

## **ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On a Sunday afternoon, July 20, 2008, Clint Chambers was arrested in the

Ocala National Forest by Christopher Crain, a U. S. Forest Service Law Enforcement

Officer.  Chambers claims that he was injured during that arrest by Crain's use of

excessive force against him.[1]

Chambers filed this action against the United States for battery under the

Federal Tort Claims Act, 28 U.S.C. § 2674 ("FTCA"), and against Crain, individually,

---

[1]     Crain's stated basis for the arrest, according to Chambers, was "resisting arrest." However, the charge of which Chambers was convicted and fined by the United States Magistrate Judge was the offense of interference with a Forest Service Officer in violation of 36 C.F.R. § 261.3 (Case No. 5:08-cr-42; Docs. 26-27). See also 7 U.S.C. § 1011(f). Any variance between the stated reason for an arrest and the charge made later is inconsequential because "[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." Lee v. Ferraro, 284 F.3d 1188, 1195-1196 (11th Cir. 2002) (quoting Bailey v. Bd. of County Comm'rs of Alachua County, 956 F.2d 1112, 1119 n. 4 (11th Cir. 1992).  Furthermore, Chambers' conviction and sentence has not been overruled or set aside, and the validity of his arrest could not be challenged in this civil action given the rule of Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364 (1994).  Still, the validity of the arrest does not foreclose a Fourth Amendment claim of excessive force in making it. Lee, 284 F.3d at 1198.

for infringement of his Fourth Amendment rights made actionable under Bivens v. Six

Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct.

1999 (1971).

Specifically, Chambers alleges that Crain used a taser device[2] against him on

seven separate occasions during the course of effecting the arrest (Doc. 15, p. 5,

¶31).  Some of those tasings,[3] he claims, were unnecessarily applied after Chambers

---

[2]    The taser device used in this case is described by the United States' expert witness
as follows (Affidavit of Steve Ijames; Doc. 31-6, p. 3):

> The X26 TASER is designed to be used in two basic ways.  The primary
> method involves the firing of two metal probes (similar to small straightened
> fish hooks), that are attached to the device by thin wires.  The probes are
> intended to contact the clothing of the targeted subject (within 1.5 inches of the
> body) or the body itself, and upon doing so complete an electronic circuit that
> interrupts the electronic command signals from the brain to body, resulting in
> muscular incapacitation.  In order to do this both probes must be attached to
> the subject, there must be sufficient distance between the probes (usually over
> 12 inches), and the device (TASER) must be activated by the pulling of the
> trigger.  When this occurs, the device has been proven statistically to
> overcome subject resistance more reliably than any other police control tool.
> The second manner of use is in the contact or "drive" stun mode.  This
> involves touching the device to the subject himself, without the attachment of
> probes, and then activating the trigger.  The same activation timing and
> process as outlined above are involved, but the device in this manner does not
> have incapacitation capability, it functions only as a pain compliance tool.

[3]    In a number of its decisions the Eleventh Circuit has confronted the need to describe
succinctly the act of using a taser (an acronym for "Thomas A. Swift's electric rifle" [a
fictitious weapon] and an echo of "maser," "laser," and perhaps the science fiction "phaser"
[from Gene Roddenberry's Star Trek]).  Although uniformly deploying "tasing" as the
participle and gerund, the court has created some precedential inconsistency by using
"tased" as the simple past tense on some occasions, and by using "tasered" at other times.
It appears that "tased" is the most frequent choice, and in the absence of an en banc
resolution to the contrary, I will lemmingly follow the present majority and used "tased" as the
simple past tense.  This results finds support in the authoritative *American Heritage
Dictionary of the English Language* which offers "tased, tasing, tases *also* tazed or tazing or
tazes," but no verb with the root "taser-."  Although stating no decision on the proper past
tense or participle, the latest iteration of the *Oxford English Dictionary* declares for the
adjectival and past participial form "tasered," as in "the tasered inmate."

had been secured by handcuffs and was fully compliant, not posing a risk of flight or danger to Crain or anyone else.  Thus, he asserts, such overuse of the taser was objectively unreasonable in violation of Chambers' Fourth Amendment rights.

The Defendants have moved for summary judgment on the ground of qualified immunity (Doc. 31).  Chambers has responded (Doc. 34) and the motion is ready for decision.  It will be granted in part and denied in part.

## Discussion

### A.   The Facts.

On the Sunday afternoon in question, July 20, 2008, Chambers traveled with his fiancee, Mary Miller and her four children, to the Juniper Springs area of the Ocala National Forest to go swimming.  During the course of the afternoon, one or more of the children began swimming in an area of the springs – the canoe launch area – in which swimming is prohibited.  Helen Jackson, an employee  of the Forest Service concessionaire that manages the area, forcefully removed one of the children from the water, pulling him out by his hair.  At least that is Chambers' account, and he promptly left the scene of that event by walking some 75 yards to the concessionaire's office in order to complain.  Once there he approached Patricia Sellers, the area manager, and asked her to call the police because one of the employees had just assaulted a nine year old child.  Ms. Sellers complied, and Officer Crain responded to the call within a few minutes.

About the same time, Helen Jackson entered the office and said "I told them to leave the park.  They need to leave now."  Officer Crain reacted by telling Chambers

to "go get your stuff; you're leaving . . . you were told to leave." Chambers responded by asking for a refund of his entrance fee, which Sellers refused. Chambers then left the office being followed by Crain. On the walk back to the place where Chambers and Ms. Miller had spread their blanket and placed their belongings, Officer Crain withdrew and replaced his taser once or twice.

Upon arrival at the site of the blanket, Ms. Miller and the children were not there.[4] Officer Crain says that he told Chambers several times to find his family, collect his belongings, and leave the Juniper Springs area. Chambers refused, saying that he was not going anywhere. Crain then told Chambers that he was under arrest and should kneel on the ground with his hands at the back of his head. Crain reached out to grasp Chambers by the arm, but Chambers forcefully yanked his arm away and refused to kneel.

Chambers' account is that he complied with all of Crain's directives up to the time Crain announced that he, Chambers, was under arrest, but he admits that he remained standing when Crain told him he was under arrest and to kneel with his hands behind his head. (Deposition of Clint Chambers; Doc. 31-5, p. 49). He never voluntarily submitted to handcuffing.

The two men agree that when Chambers failed to kneel, Crain deployed his taser probes for the first time. That tasing was without effect, and it was followed by at least two and perhaps three additional drive stun taser contacts with Chambers'

---

[4] The facts as narrated up to this point are essentially undisputed. To the extent there are some differences in the testimony of the parties and witnesses about the events so far, the differences are immaterial for purposes of summary judgment.

body, also without success in Crain's effort to subdue and handcuff Chambers.  At that point in the ongoing struggle, two male bystanders came to Officer Crain's aid, and while Crain continued to apply the taser to Chambers in drive stun mode at least once more during that phase of the physical altercation, Chambers was finally controlled and handcuffed.[5]

What happened after Chambers was placed in the restraint of handcuffs is in sharp dispute.  Chambers claims that when he was lifted to his feet and released by the bystanders, he was dazed and fell backward over a small divider wall.  Thereupon, Chambers says, Crain yelled that he should stop fighting, and then tased him on the neck and on the back of his head at least two more times.  Crain denies that any tasings occurred after Chambers was handcuffed.

**B.**     **The Law Regarding Qualified Immunity.**

In Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727 (1982), and its progeny, the Supreme Court has identified a qualified immunity from suit – not merely a defense to the claim – that inures to the benefit of law enforcement officers and other governmental actors in the performance of their official duties.  The necessary purpose of the grant of immunity is to allow governmental officials to carry out their discretionary duties without constantly looking over their shoulders in fear of personal liability or harassing litigation, "protecting from suit 'all but the plainly incompetent or

---

[5]     Chambers contends that, in addition to the use of the taser, Crain kicked or "stomped" on his torso while he, Chambers was on the ground struggling with the intervening bystanders.  Further, Chambers argues that the bystanders gouged him in the eye and twisted his neck, but they are not parties and there is no evidence leading to a factual or legal conclusion that Crain or the United States should be held responsible for their actions. They volunteered their help.

one who is knowingly violating the federal law.'" Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting Willingham v. Loughnan, 261 F.3d 1178, 1187 (11th Cir. 2001)).  See also Oliver v. Fiorino, 586 F.3d 898, 904 (11th Cir. 2009).  It is, therefore, a "qualified" immunity in the sense that it is not absolute and does not shield every act taken by a law enforcement officer in the performance of his duty.  Rather, with respect to claims of excessive force in making an arrest of a free person, the immunity exists whenever:  (1) the governmental actor was performing a discretionary function in discharging his official duties at the time of the arrest; unless the claimant shows (2) the force used was objectively unreasonable and therefore unconstitutional; and (3) the force used was contrary to and prohibited by clearly established law about which a reasonable law enforcement officer would have known at the time the alleged violation occurred.  E.g., Harlow, 457 U.S. at 818, 102 S. Ct. at 2738; Chandler v. Secretary of Florida Dept. of Transp., 695 F.3d 1194, 1198 (11th Cir. 2012); Mann v. Taser International, Inc., 588 F.3d 1291, 1305 (11th Cir. 2009).

As in most cases like this one, there is no dispute that, in arresting Chambers, Crain was performing a discretionary function in the course of his work as a National Forest Law Enforcement Officer.  The remaining issues to be decided, therefore, are whether Officer Crain used excessive or objectively unreasonable force in carrying out the otherwise lawful arrest of Chambers; and, if so, whether clearly established law, of which a reasonable officer would have known at the time, gave notice that the degree of force employed violated Chambers' constitutional rights.

Even though these issues are presented as a result of a defense – the assertion of qualified immunity by the defendant – once it is established that the defendant was a governmental actor performing a discretionary function, the burden of persuasion shifts to the plaintiff concerning these remaining issues.  In his attempt to carry that burden, the plaintiff is entitled to have the facts viewed in a light most favorable to the plaintiff even though such facts may not be the "actual" facts of the case as later determined at trial if the motion for summary judgment is denied.  E.g., Zivojinovich v. Barner, 525 F.3d 1059, 1062 (11th Cir. 2008); Priester v. City of Riviera Beach, 208 F.3d 919, 926 n.3 (11th Cir. 2000); Cottrell v. Caldwell, 85 F.3d 1480, 1486 (11th Cir. 1996).  Further, once the operative facts have been determined for purposes of summary judgment (or, if necessary at trial) evaluation of the objective reasonableness of the defendant's acts under the Fourth Amendment is a pure question of law, not to be submitted to a jury.  Scott v. Harris, 550 U.S. 372, 381 n. 8, 127 S. Ct. 1769, 1776 n. 8 (2007); McQueen v. Johnson, 506 Fed. Appx., 909, 911 n.1 (11th Cir. Feb. 5, 2013); Chaney v. City of Orlando, 291 Fed. Appx. 238, 243 (11th Cir. Aug. 26, 2008).[6]

In Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865 (1989), the Supreme Court taught that claims of excessive force in making an arrest of a free person must be analyzed under the objective reasonableness standard of the Fourth Amendment, bearing in mind that every arrest by law enforcement carries with it the right to use

---

[6]     Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.  See 11th Cir. R. 36-2.

some degree of physical coercion to effect it, and that every case should be judged on the basis of its particular facts and circumstances.  In evaluating the force that was used, consideration should be given to the severity of the crime, whether the suspect posed an immediate threat to the safety of the officer or others, and whether the suspect was actively resisting or attempting to evade arrest by flight.[7]  Courts were also admonished to remember, and make allowance for, "the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  490 U.S. at 397, 109 S. Ct. at 1872.

Finally, with respect to the approach to be taken in deciding qualified immunity issues, the Court in Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808 (2009) receded from Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151 (2001) and held that the two issues concerning the constitutionality of the force used and whether the state of the law was clearly established at the time in question, may be approached in either sequence.  See also, Fils v. City of Aventura, 647 F.3d 1272, 1287 (11th Cir. 2011) and Oliver, 586 F.3d at 905.

In this instance the Court will first canvass the state of the law of the Circuit regarding the use of tasers in effecting an arrest of free persons.  This seems to be

---

[7]    The Court rejected consideration of whether arresting officers acted "maliciously and sadistically for the very purpose of causing harm" – one of the elements of the standard applied by the cases analyzing excessive force claims governed by the Eighth Amendment or the due process clause of the Fourteenth Amendment – because that test is incompatible with the objective reasonableness requirement of the Fourth Amendment.  The intention of the arresting officer, whether good or bad, is irrelevant to the objective test of the Fourth Amendment.

the most logical approach here because there is a significant body of law in the Eleventh Circuit concerning the use of tasers, and that accumulated law will help to inform the decision concerning the constitutionality of the tasings of Chambers as well as the decision, if it becomes necessary, concerning what was "clearly established" in the law as of July 20, 2008, the date of Chambers' arrest.

## C.    The Law Of The Circuit Regarding Tasers.

The Eleventh Circuit has now had numerous occasions to consider excessive force claims arising out of the use of tasers or stun guns during an arrest of a free citizen by a law enforcement officer.  All of those cases have been heard within the last ten years, and only three were decided before July 20, 2008.

1.    Cases Decided before July 20, 2008.

(a)    The first of those three decisions was Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004).  During a traffic stop, a single use of the taser to control a verbally belligerent, non-compliant subject "was [found to be] reasonably proportionate to the need for force and did not inflict any serious injury." Id., 369 F.3d at 1278.  The court held there was no violation of any constitutional right; the issue of qualified immunity was rendered moot and not reached.

(b)    In Zivojinovich v. Barner, 525 F.3d 1059 (11th Cir. 2008), decided on April 23, 2008, two attendees at a New Year's Eve party were asked to leave the premises of the host hotel.  They were escorted out by police officers and a physical scuffle ensued during which both were tased.  One of the subjects was tased after being handcuffed, and that was the only use of the taser claimed by the plaintiff to be

9

excessive and unconstitutional.  The defendant officer explained that he used the taser on that occasion because the subject was spitting blood on him – the blood being the result of a broken nose suffered during the earlier stages of the altercation. The court cited Draper and held that the use of the taser under those circumstances was reasonable, not unconstitutional; and, as in Draper, the issue of qualified immunity was not reached.

(c)   The lone remaining decision of the circuit handed down before July 20, 2008, that involved use of a taser during the arrest of a free person is Moretta v. Abbott, 280 Fed. Appx. 823 (11th Cir. 2008) decided June 2, 2008.[8]  There was a disruption at a school during which a child broke a picture frame.  The result of the case can easily be surmised from the fact that the subject who was tased was a six year old first grader standing 3 feet 5 inches tall, weighing 53 pounds.  He had a piece of glass in his hand from the broken frame but was not posing a threat to himself or anyone else.  The court concluded that use of the taser was objectively unreasonable and that qualified immunity did not apply because of the "obvious clarity" of the constitutional violation.[9]  Id., 280 Fed. Appx. at 825.

_____

[8]      Because unpublished decisions are, by rule, "not considered binding precedent," they cannot constitute a part of the body of law to be examined in deciding whether the law of the circuit was "clearly established" concerning an issue of qualified immunity. See Floyd v. Corder, 426 Fed. Appx.790, 792 (11th Cir. May 12, 2011).  There is, however, no impediment to considering the case, as well as other cases decided after July 20, 2008, in evaluating the threshold issue of whether Crain's actions were objectively unreasonable and therefore unconstitutional.

[9]      If it is determined that the degree of force used by an officer in making an arrest was objectively unreasonable in violation of the Fourth Amendment, and the inquiry turns to the issue of whether he knew or should have known under clearly established law that his

In summary, at the time of the events involved in this case, July 20, 2008, there were only two cognizable Eleventh Circuit decisions involving use of a taser device in making an arrest of a non-compliant free person – that is, cases governed by the Fourth Amendment – and both had found such use to be reasonable, not unconstitutional.  To be sure, each of those cases involved a single use of the taser whereas this case presents multiple tasings, but that difference is of little consequence in either stage of a qualified immunity analysis in which the ultimate focus is upon conduct that the law <u>condemns</u>, not so much on conduct that the Constitution <u>allows</u>.  The Court might well conclude the analysis at this point, therefore, by simply declaring that Crain's use of the taser (at least up to the time that Chambers was handcuffed) was not objectively unreasonable <u>or</u>, even if it was, that Crain is entitled to qualified immunity for those acts because the law was not clearly established to that effect at the time.  There would still be an issue, however, concerning Chambers' claim that he was unnecessarily tased after he was handcuffed and no longer posed a physical threat or risk of flight.  Later cases should be examined to determine whether such abuse – taking Chambers' testimony that it

_____

conduct was unconstitutional, the "clearly established" requirement may be met in one of three ways:  (1) showing that a materially similar case had already been decided; (2) showing that an accepted general principle should control the novel facts of the case with obvious clarity; or (3) showing that the conduct in question so obviously violated the constitution that no prior case law is necessary.  <u>See</u>, <u>e.g.</u>, <u>Hope v. Pelzer</u>, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002); <u>Loftus v. Clark-Moore</u>, 690 F.3d 1200, 1204-05 (11th Cir. 2012); <u>Terrell v. Smith</u>, 668 F.3d 1244, 1255 (11th Cir. 2012).  The body of law to be examined consists of the decisions of the Supreme Court of the United States, the published decisions of the Circuit and the decisions of the pertinent state supreme court.  <u>Oliver</u>, 586 F.3d at 907 (citing <u>McClish v. Nugent</u>, 483 F.3d 1231, 1237 (11th Cir. 2007)).

occurred – constituted: (1) objectively unreasonable force in violation of the Constitution; and, if so (2) whether the violation was one of such "obvious clarity" that the law should be deemed to have been clearly established even in the absence of comparable decisions as of July 20, 2008.

　　　　2.　　Cases Decided After July 20, 2008.

In all of the excessive force cases involving tasers decided by the circuit since late 2008, qualified immunity has been denied on five occasions.  Powell v. Haddock, 366 Fed. Appx. 29 (11th Cir. Feb. 12, 2010);  Oliver, 586 F.3d 898;  Fils, 647 F.3d 1272;  Harper v. Perkins, 459 Fed. Appx. 822 (11th Cir. Feb. 29, 2012); and Thompson v. Mostert, 489 Fed. Appx. 396 (11th Cir. Sept. 12, 2012).

On the other hand, qualified immunity has been granted in seven cases. Chaney, 291 Fed. Appx. 238; Buckley v. Haddock, 292 Fed. Appx. 791 (11th Cir. Sept. 9, 2008); German v. Sosa, 399 Fed. Appx. 554 (11th Cir. Oct. 12, 2010); Floyd v. Corder, 426 Fed. Appx. 790 (11th Cir. May 12, 2011); Hoyt v. Cooks, 672 F.3d 972 (11th Cir. 2012); McQueen, 506 Fed. Appx. 909; and Brown v. Calicchio, 510 Fed. Appx. 822 (11th Cir. Feb. 25, 2013).

Each group of those decisions will be examined in sequence.

　　　　　　(a)　　The Cases In Which Qualified Immunity Was Denied.

　　　　　　　　(i)　　Powell v. Haddock involved a family altercation at the side of a highway.  Powell was one of the participants in the argument.  Officers arrived at the scene to investigate.  According to Powell's testimony, one of the officers grabbed Powell by the arm "as though to push her off the road as she was telling him what had

happened." 366 Fed. Appx. at 30. Powell told the officer to get his hands off of her, and then took a few steps away. Another officer told Powell that if she did not obey commands he was going to use his taser. Powell raised her hands and said "you're going to do what?" Id. Then, without further warning, Powell was tased and fell to the ground. While she was on the ground, Powell was tased a second time and was then arrested on a charge of resisting arrest. The court held that, on these facts, use of the taser was objectively unreasonable. Further, qualified immunity was denied because:

> . . . it was clearly established, at the time of Powell's arrest that such force cannot constitutionally be used against a non-threatening suspect when the alleged crime of the suspect is a minor offense. See Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002) (holding that it violates the Fourth Amendment to use pepper spray on an individual suspected of resisting an officer when that individual was not posing a threat).

366 Fed. Appx. at 31.

(ii)     Oliver v. Fiorino involved a pedestrian, Oliver, standing in the median of a divided highway. He flagged the attention of a passing police officer and claimed that someone had been shooting at him. During the ensuing encounter, Oliver displayed emotional distress but never acted in a threatening or belligerent manner; was never suspected or accused of having committed a crime; was never told that he was under arrest; and there was never any effort to handcuff him before he was tased. As an officer was attempting to guide Oliver across the street to an area of greater safety, Oliver pulled away and was immediately tased without warning. Oliver fell to the ground and never got up. While lying incapacitated he was tased at

least seven more times and, finally, was handcuffed.  He was then taken to a hospital where he died as a result of the tasings.  The court, citing Draper, supra, found that the initial tasing when Oliver pulled away from the officer, "may" have been justified, but after applying the factors identified by Graham v. Connor,[10] supra, the court concluded that the remaining uses of the taser were grossly disproportionate, unreasonable and unconstitutional.  586 F.3d at 906-07.  With respect to whether the constitutional violation was clearly established by the law at the time of the incident, the court found no governing cases but applied the "obvious clarity" standard (see note 9, supra) and denied qualified immunity.  Id. at 907-08.

(iii)    Fils v. City of Aventura involved a late night disturbance that spilled into the parking lot of a billiards parlor.  Two people had been arrested. Maurice, the Plaintiff, was standing in the area talking to the promoter of the evening's events in the billiard parlor. Maurice remarked in the language of the gutter that the police were overreacting.  He was overheard by an officer standing to his rear who questioned, also in the language of the gutter, what Maurice had said.  Maurice turned around and saw the officer standing only a few feet away with his taser drawn. Maurice raised his hands and stepped back one step.  Without warning, or giving any command, the officer tased Maurice who stood "frozen" without falling.  He was then tased a second time by another officer and fell to the ground at which time the first

---

[10]    E.g., the severity of the offense or offenses for which the arrest is being made; whether the suspect poses a threat of harm to the arresting officer or others; and whether the suspect is resisting arrest or poses a risk of flight.  Graham, 390 U.S. at 396, 109 S. Ct. at 1872.

officer jumped on his back and applied a stun drive taser contact to the back of his neck in a "grinding" manner.  Throughout these events Maurice never disobeyed a command, never threatened anyone and did not attempt to resist or flee.[11]

Again applying the three prong test of Graham v. Conner, supra, 490 U.S. at 396, 109 S. Ct. at 1872, involving assessment of the severity of the crime for which Maurice was being arrested (a false charge of resisting arrest); the threat, if any, posed by Maurice to the arresting officers or others (there was none); and the degree of resistance or attempted flight (again, there was none), the court easily concluded that the acts of the officers using the taser were objectively unreasonable in violation of Maurice's Fourth Amendment rights.  Fils, 647 F.3d at 1288-1289.

The court then turned to the question of whether the law was clearly established at the time of Maurice's arrest that the conduct of the arresting officers as described by Maurice was in violation of the Fourth Amendment.  Finding no substantially similar case involving the abusive use of a taser in effecting an arrest, the court nevertheless  determined that the law of the circuit was well established in Priester, 208 F. 3d 919  (release of an attack dog against a fully compliant subject lying on the ground), and Vinyard v. Wilson, 311 F.3d 1340 (11th Cir. 2002) (the pepper spray case relied upon in Powell, supra) that the use of a taser or comparable force against the perpetrator of a minor offense is excessive and objectively

_____

[11]     The facts related here are the facts as sworn by the plaintiff Maurice.  The defendant officers gave an entirely different version.  For purposes of summary judgment on the issue of qualified immunity, the court accepted the plaintiff's presentation of the facts in accord with established precedent.  See Priester, Zivojinovich, and Cottrell, supra.

unreasonable in violation of the Fourth Amendment absent physical resistance, belligerent refusal to obey commands, or threat of flight. Fils, 647 F.3d at 1291-92. The court also held, alternatively, that even if those comparable cases had not been decided, use of unnecessary force against a fully compliant arrestee charged with a minor offense would be within the "obvious clarity" mode of identifying clearly established law. Id. at 1292.  Summary judgment based upon qualified immunity was denied.

(iv)   Harper v. Perkins involved a number of officers responding to a domestic disturbance report.  Upon arrival at the scene they observed Harper standing on a limb up in a tree, approximately four feet above the ground, with his hands raised above his head.  A firearm was leaning near the trunk of the tree but it was not within Harper's reach; he was unarmed and his hands were visible.  He was tased twice causing him to fall out of the tree resulting in a paralyzing injury.  The court found that the use of the taser was "disproportionate to any threat posed and unreasonable under the circumstances." 459 Fed. Appx. at 827.  The court then held that the law demonstrating the unconstitutional nature of the officer's actions was clearly established under the "obvious clarity" test notwithstanding the absence of a factually similar case or cases.  Id. at 827-28.

(v)   Thompson v. Mostert involved a situation in which Thompson's son had been arrested and was sitting in handcuffs at the end of Thompson's driveway.  Thompson approached his son with the permission of the arresting officers but then told his son not to say another word.  This enraged the

officers, according to Thompson, and he was immediately arrested and handcuffed without resistance.  Nevertheless, the officers forced him to the ground and deployed a taser into his back.  This conduct, if true, was found to be unconstitutional  and summary judgment on the basis of qualified immunity was denied.[12]  489 Fed. Appx. at 397-98.

(b)   Cases In Which Qualified Immunity Was Granted.

(i)   Chaney v. City of Orlando involved a traffic stop during which the driver, Chaney, refused to produce his license, registration or proof of insurance; disobeyed the officer's command to remain in his vehicle; and physically resisted the officer's effort to arrest and handcuff him, resulting in a struggle on the ground that prompted the officer to deploy his taser.  When Chaney disobeyed an order to remain on the ground and tried to sit up, the officer tased him a second time. The court held that there was no evidence at trial that the officer's conduct "was so obviously wrong that he would have known that it was unlawful." 291 Fed. Appx. at 244.  More specifically, there was no case law putting him on notice that the use of a taser constituted unreasonable or excessive force.  Id.  The officer was granted qualified immunity.[13]

---

[12]     The court did not discuss any issue as to whether the Fourth Amendment violation was established by "clearly existing" law.

[13]     In a number of cases the courts tend to mingle or collapse into a single analysis the separate questions of whether there was a constitutional violation and, if so, whether the law was clearly established to that effect.  Chaney can be read to be such a decision.  Properly understood, however, the holding of the case was an alternative decision:  there was no objectively unreasonable force used in violation of the Fourth Amendment, but even if there was, qualified immunity applied because the law was not clearly established at the time.

(ii)     <u>Buckley v. Haddock</u> also involved a traffic stop in which the motorist, Buckley, refused to sign a traffic citation, as required by Florida law; allowed himself to be arrested and handcuffed; but then sat on the ground at the rear of his vehicle and refused numerous commands to stand up.  The officer gave repeated warnings that a taser would be used if he did not comply and, ultimately, Buckley was tased three times before another officer arrived to give assistance in removing Buckley to the patrol car.  A divided court held that the "Defendant's use of force in this particular situation was not outside the range of reasonable conduct under the Fourth Amendment."  292 Fed. Appx. at 794.  The court also decided that even if the force used was constitutionally excessive, that conclusion was not clearly established by the law at the time so that qualified immunity applied.[14]  <u>Id.</u> at 797-99.

(iii)     <u>German v. Sosa</u> involved a subject who was attempting to swallow cannabis while being arrested.  One of the arresting officers tased the subject in an effort to prevent the loss of the contraband.  Approaching the issue in reverse sequence (that is, going directly to the "clearly established" inquiry without first deciding whether the challenged behavior – use of the taser – was "objectively unreasonable") the court concluded that there was no pertinent case law condemning the use of a taser in the circumstances of the case and that the officer was entitled to qualified immunity.  399 Fed. Appx. at 557-58.

---

[14]     Chief Judge Dubina concurred in the disposition on that ground.  292 Fed. Appx. at 799.

(iv)   <u>Floyd v. Corder</u> involved a disruption at a school.   A schoolboy's uncle had come to pick him up at the end of the school day.   While they were walking in the hallway a teacher heard a noise that sounded like the uncle had hit the child.   The teacher summoned a deputy from the school office.   The deputy confronted the uncle who did not respond, but continued moving toward the nephew.   The Deputy put up his hand to stop the uncle's advance but the uncle pushed or hit the Deputy's arm away.   The Deputy then unholstered his taser and warned the uncle to get on the floor.   The uncle did not comply.   He continued walking away.   The Deputy told him to stop but he did not comply.   The Deputy deployed his taser three times before the uncle was subdued and arrested.   As in <u>German v. Sosa</u>, <u>supra</u>, the court approached the case before it in reverse sequence.   It assumed for purposes of the decision that the force used was objectively unreasonable, but granted qualified immunity summary judgment on the basis that there was no clearly established law in any similar cases finding the tasings to be objectively unreasonable in violation of the Fourth Amendment.   426 Fed. Appx. at 792.

(v)   <u>Hoyt v. Cooks</u> involved an emotionally disturbed subject who had telephoned 911 three times to report that he was being "sewn up in a suit" and that "demons were trying to get him."   An officer arrived in the early morning hours and was met in the driveway by the subject who started screaming and yelling that the officer "was a demon who needed to be killed."   672 F.3d at 975.   When the officer exited his patrol car the subject repeated that demons were trying to get him and that the Officer was one of the demons.   When commanded to get on the ground the

subject complied, but when ordered to extend his arms behind him for handcuffing, the subject refused.  He was then tased but still refused to submit his arms for handcuffing.   After several drive stun contacts the subject relented and was handcuffed.

Here again the court began its analysis by going first to the issue of whether the law was clearly established that the tasings of the subject were unconstitutional at the time in question.  No pertinent case law was found and the officer's conduct under the circumstances did not meet the "obvious clarity" standard.  672 F.3d at 977-980. Qualified immunity was granted.

(vi)   McQueen v. Johnson was a bizarre case in which a plainclothes officer was mistaken by other officers for an armed robber of a liquor store.  The plainclothes officer exited the liquor store at the command of the other, unknowing officers waiting outside.  He had two visible firearms on his person and was carrying a telephone in his right hand.  He was told to get off the phone and get on the ground.  He started to kneel but retained the telephone in his hand.  One of the waiting officers thought he was not being compliant and deployed his taser.  The plainclothes officer fell forward with his hands underneath his body and not visible to the other officers.  He was ordered to reveal his hands and was tased again at least two times when he failed to do so.  He was then handcuffed and his true identity was verified.   The plainclothes officer sued and the other officers sought qualified immunity.

20

The court held that the tasings were reasonable.  The tasing officers reasonably believed they were dealing with an armed robber.  He had two visible weapons on his person and decided to approach the officers while still holding a telephone he had been told to release.  "From a reasonable officer's perspective, McQueen was, at best, questionably compliant with the officers' commands."  506 Fed. Appx. at 915. There was no violation of the Fourth Amendment.

(vii)   Brown v. Calicchio involved a domestic disturbance.  When called to the scene, the responding officers forcibly entered the subject's apartment without a warrant but with a well founded belief that the subject posed a danger to his own well being.  The subject was discovered inside with a large kitchen knife being held to his neck, screaming that he was not going back to jail.  When he refused to drop the knife the officers tased him.  The court found the action of the officers to be reasonable; there was no violation of the Fourth Amendment and, therefore, no occasion to consider qualified immunity.  510 Fed. Appx. at 823.

3.   Reconciliation Of The Cases Granting And Those Denying Qualified Immunity.

The most appropriate basis on which to compare the two groups of taser cases is the way in which the  Court of Appeals has applied the three prong test of Graham v. Connor in all of them.  The difference between the two sets of cases on that basis is clear, consistent and conspicuous.  In all of the examples in which qualified immunity has been denied, the offense or purported offense justifying an arrest was minor or non-existent, the subject who was tased posed no immediate threat to the

officers or others, and the subject was compliant, not resisting or attempting to evade arrest by flight.  The use of a taser device in those circumstances has been universally treated by the court of appeals as excessive or objectively unreasonable in violation of the Fourth Amendment.  Additionally, in those cases, the court has consistently found that the "clearly established" law condemning such conduct (for purposes of qualified immunity analysis) has been met either by the prior decisions in Priester and Vinyard, supra, or by the "obvious clarity" exception to the general requirement of materially similar precedent.

Conversely, in all of the cases in which qualified immunity has been granted, while the underlying offense justifying arrest is not uniformly serious, the cases are universally characterized by violent or non-compliant belligerent behavior on the part of the subject, posing a clear threat to the safety of the officer if he or she had proceeded to engage in hand-to-hand combat in an effort to secure the subject by handcuffing without the incapacitating aid of the taser.

**D.    Application Of The Law To This Case.**

Viewing the facts in the light most favorable to Chambers, the Court concludes that partial summary judgment should be granted with respect to any claim of Chambers for liability or damages based upon any tasings or other force used against his person up to the time that he was handcuffed.  There is no genuine issue of material fact that Chambers was, up to that point in time, aggressively and physically resisting being handcuffed incident to arrest.  To the extent there are differences in the factual accounts of the witnesses and parties concerning the details of the

encounter between Chambers and Officer Crain, the Court finds those differences to be immaterial. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S. Ct. 2505, 2510 (1986) (emphasis in original). See also, Johnson v. Niehus, 491 Fed. Appx. 945, 950 (11th Cir. Oct. 16, 2012). Here, there can be no genuine dispute that Chambers physically resisted Crain's attempt to complete an arrest by handcuffing him. Chambers has admitted that he refused to kneel and be handcuffed on Crain's command, and his continuing resistance is established by the indisputable fact that two disinterested strangers found it necessary to physically intervene in aid of Crain whom they perceived to be fighting a losing battle.

## **Conclusion**

In summary, there was no objectively unreasonable use of force by Crain – and no violation of the Fourth Amendment – up to the time that Chambers was brought under physical control and handcuffed. Or, alternatively, if there was a constitutional violation during that phase of the engagement, Crain would be, and is, entitled to qualified immunity with respect to that part of the Bivins claim because the applicable law was not clearly established that use of the taser was constitutionally prohibited in the factual circumstances Crain was confronting. The motion for summary judgment (Doc. 31) will be, and is, GRANTED to that extent.

On the other hand, there are material issues of fact with respect to the tasings, if any, that occurred after Chambers was handcuffed; and the law is, and was, clearly established as of 2008 that the "gratuitous" use of force against an already restrained and non-resisting arrestee is excessive.

> As we have held on numerous occasions, the gratuitous use of force when a criminal suspect is restrained and not resisting arrest constitutes excessive force. See Reese v. Herbert, 527 F.3d 1253, 1273-74 (11th Cir. 2008); Hadley v. Gutierrez, 526 F.3d 1324, 1333-34 (11th Cir. 2008); Vinyard v. Wilson, 311 F.3d 1340, 1347-48 (11th Cir. 2002); Slicker v. Jackson, 215 F.3d 1225, 1232-33 (11th Cir. 2000). Moreover, this Court's precedent gave clear notice to a reasonable officer that this excessive force used without justification is unconstitutional. See, e.g., Lee, 284 F.3d at 1199; Vinyard, 311 F.3d at 1348-49; Slicker, 215 F.3d at 1232-33.

Runge v. Snow, 2013 WL 1223483 at *3 (11th Cir. Mar. 27, 2013).

The motion for summary judgment (Doc. 31) will be, and is DENIED with respect to the events that occurred after Chambers was restrained by handcuffing. With respect to trial of the Bivins claim before a jury, the Court's intent will be to use special interrogatories to obtain a jury verdict with respect to the disputed issues of critical historical fact. The Court will then apply the law to those facts in accord with the procedure prescribed by the Court of Appeals in Johnson v. Breeden, 280 F.3d 1308, 1317 (11th Cir. 2002).

The trial of the FTCA claim, and settlement of the law applicable to that claim, may require separate consideration. The motion for summary judgment (Doc. 31) was jointly filed by both Defendants, and no effort was made in the motion or the

supporting memorandum – or in Chambers' response (Doc. 34) – to differentiate between Chambers' claims with respect to application of the law of qualified immunity.

Qualified immunity is clearly an available defense in the case of a federal officer who is sued under <u>Bivins</u>.  <u>Camreta v. Greene</u>, ___ U. S. ___, 131 S. Ct. 2020, 2030-31 (2012).  Whether that defense is available as such in an FTCA action is much less clear.  <u>See</u> <u>Castro v. United States</u>, 34 F.3d 106, 111 (2d Cir. 1994).

For now, the Court's ruling on the motion as announced in this order will be limited to Chambers' claim under <u>Bivins</u>.  Because the FTCA claim will be tried to the Court, not a jury, and because the Court's ruling is that the qualified immunity defense is only partially available so that a trial will be necessary in any event, the issue concerning application of qualified immunity to an FTCA claim will be carried with the case to be addressed by the parties at trial or, if either wishes to do so, by the filing of an appropriate motion and memoranda for further consideration before trial.

The Defendants' joint motion for summary judgment (Doc. 31) is GRANTED in part and DENIED in part as provided in this Order.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida, this <u>13th</u> day of August, 2013.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
             Maurya McSheehy, Courtroom Deputy